IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| J & J SPORTS PRODUCTIONS, INC., | ) ) ) | CIVIL NO. 13-00220 LEK-RLP |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| ANACLETO S. ALCANTARA, JR., and CARMELITA ALCANTARA d/b/a FILIPINO EXPRESS RESTAURANT, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT ANACLETO S. ALCANTARA JR.'S
MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Anacleto S. Alcantara,

Jr.'s ("A. Alcantara") Motion for Summary Judgment ("Motion"),

filed on January 24, 2014. [Dkt. no. 16.] Plaintiff J & J

Sports Productions, Inc. ("J & J") filed its memorandum in

opposition to the Motion on February 17, 2014, and A. Alcantara

filed his reply on February 24, 2014. [Dkt. nos. 19, 22.] This

matter came on for hearing on April 3, 2014. Appearing on behalf

of A. Alcantara was Kevin Herring, Esq., and appearing on behalf

of J & J was Dan Ikehara, Esq. After careful consideration of

the Motion, supporting and opposing memoranda, and the arguments

of counsel, A. Alcantara's Motion is HEREBY GRANTED for the

reasons set forth below.

## BACKGROUND

J & J filed its Complaint on May 6, 2013, and its First Amended Complaint on September 9, 2013. [Dkt. nos. 1, 7.] The defendants in this action are A. Alcantara and Carmelita Alcantara ("C. Alcantara"), collectively doing business as Filipino Express Restaurant ("Filipino Express").[1] C. Alcantara was served with the Summons on October 15, 2013, [Proof of Service, filed 10/16/13 (dkt. no. 15),] but has not entered an appearance in this action. J & J obtained an Entry of Default against C. Alcantara on March 12, 2014. As of the date of this order, J & J has not moved for default judgment against C. Alcantara.

J & J filed this action pursuant to the Communications Act of 1934, as amended, 47 U.S.C. § 605, *et seq.* ("the Communications Act"), and the Cable Television Consumer Protection and Competition Act of 1992, as amended, 47 U.S.C. § 553, *et seq.* ("the Cable Act"). [First Amended Complaint at ¶ 1.] The First Amended Complaint alleges that J & J was the exclusive nationwide television distributor of the May 7, 2011 Manny Pacquiao v. Shane Mosley World Boxing Organization Welterweight Championship Fight Program, including "all under-

---

[1] This Court will refer to A. Alcantara and C. Alcantara collectively as "Defendants." C. Alcantara is A. Alcantara's mother. [Motion, Decl. of Anacleto Alcantara, Jr. ("A. Alcantara Decl.") at ¶ 6.]

card bouts and fight commentary encompassed in the television broadcast of the event" ("the Program"). [Id. at ¶ 8.] The First Amended Complaint also alleges that Defendants violated J & J's rights by exhibiting the Program, at the time of the Program's transmission, at 94-366 Pupupani Street, Waipahu, Hawai`i 96797, without a sub-licensing agreement with, or other consent from, J & J. [Id. at ¶ 11.] The First Amended Complaint alleges that Defendants "are or were owners, and/or operators, and/or licensees, and/or permitees, and/or persons in charge, and/or individuals with dominion, control, oversight and management of the commercial establishment and doing business as FILIPINO EXPRESS RESTAURANT located at 94-366 Pupupani Street, Waipahu, Hawaii 96797." [Id. at ¶ 6 (emphasis in original).]

The First Amended Complaint asserts the following claims: violation of the Cable Act ("Count I"); violation of the Communications Act ("Count II"); and a state law conversion claim ("Count III"). The First Amended Complaint prays for the following relief: as to Counts I and II - $10,000.00 in statutory damages and $100,000.00 in enhanced damages; as to Count III - compensatory and punitive damages; and as to all counts - reasonable attorneys' fees, costs, and any other appropriate relief.

The crux of A. Alcantara's Motion is that he is entitled to summary judgment on all claims against him because he

3

does not own, have a financial interest in, manage, or have supervisory control over Filipino Express, and because he was not in Hawai`i on or around the day of the alleged illegal interception and broadcast of the Program. [Motion at 2.]

**DISCUSSION**

I. **J & J's Supplemental Affidavit**

On February 26, 2014, two days after A. Alcantara filed his Reply, J & J filed an affidavit by Joseph Gagliardi ("the Supplemental Affidavit"). [Dkt. no. 24.]

Relevant to the instant Motion, Local Rule 7.4 sets forth the filing deadlines for a memorandum in opposition to a hearing motion and a reply in support of a hearing motion. It also 7.4 states: "No further or supplemental briefing shall be submitted without leave of court." J & J filed the Supplemental Affidavit without obtaining leave of court. This Court therefore STRIKES J & J's Supplemental Affidavit.

This Court now turns to the merits of A. Alcantara's Motion.

II. **Exclusive Remedies**

This Court will first address A. Alcantara's argument that the remedies under the Communications Act and the remedies under the Cable Act are mutually exclusive. He asserts that an illegal interception is either an interception of a cable signal, in violation of 47 U.S.C. § 553, or an interception of a

4

satellite signal, in violation of 47 U.S.C. § 605. Thus, one interception cannot violate both provisions. A. Alcantara asks this Court to grant summary judgment in his favor as to Count II because there is neither an allegation nor any evidence that Defendants intercepted a cable signal.

As to the relationship between § 553 and § 605, at least one district court within the Ninth Circuit has stated:

> Both of these statutes combat theft of television signals. To oversimplify, § 553 deals with theft of cable television communications, while § 605 deals with theft of satellite television communications. J & J seeks statutory damages under both statutes, including $100,000 under § 605 and $50,000 under § 553. To award plaintiff this entire amount, the Court would have to conclude that defendants simultaneously violated both statutes by airing a single television program.
>
> There is no Ninth Circuit authority authorizing such an approach. Three of the four circuits addressing the issue — the First, Third, and Seventh — hold that § 605 and § 553 are mutually exclusive. See Charter Commc'ns Entm't I, DST v. Burdulis, 460 F.3d 168, 173–78 (1st Cir. 2006); TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 197 (3d Cir. 2001); United States v. Norris, 88 F.3d 462, 466–69 (7th Cir. 1996). Only the Second Circuit holds that both § 553 and § 605 may potentially apply to theft of cable television signals. See Intern'l Cablevision, Inc. v. Sykes, 75 F.3d 123, 133 (2d Cir. 1996). But even the Second Circuit did not authorize damages under both sections. It remanded to the district court to determine damages under § 605, which allows for greater recovery than does § 553. Id. at 129 (remanding for imposition of damages under § 605(3) "'instead of . . . the lesser damages available under § 553'") (citation omitted, emphasis added). See also Integrated Sports Media, Inc. v. Naranjo, Case No.

> 1:10-cv-00445-AWI-SMS, 2010 WL 3171182, at *3
> (E.D. Cal. Aug. 11, 2010) ("the majority of courts
> in the Ninth Circuit and elsewhere have imposed
> damages only pursuant to one of the two
> sections."). But see Home Box Office v. Gee-Co,
> Inc., 838 F. Supp. 436, 439-40 (E.D. Mo. 1993)
> (awarding damages under § 553 and § 605).

J & J Sports Prods., Inc. v. Frei, No. 4:12-cv-0127-BLW, 2013 WL

3190685, at *2 (D. Idaho June 21, 2013) (alterations in Frei);

see also Joe Hand Prod., Inc. v. Behari, No. 2:12-cv-1522 KJM AC,

2013 WL 1129311, at *4 (E.D. Cal. Mar. 18, 2013) (noting split of

authority among circuits).

　　　　The United States District Court for the Eastern

District of California has stated that a plaintiff's § 553 claim

and the plaintiff's § 605 claim "may be mutually exclusive

following discovery," but the defendant's argument that the

plaintiff could not recover damages under both sections did "not

constitute an affirmative defense of election of remedies."

J & J Sports Prods., Inc. v. Bear, No. 1:12-cv-01509-AWI-SKO,

2013 WL 708490, at *6-7 (E.D. Cal. Feb. 26, 2013).  The district

court also stated that "Plaintiff is entitled to plead

alternative theories of relief without making an election of

remedies at the pleading stage.  Defendant remains free to argue

on the merits that Plaintiff is unable, as both a factual and

legal matter, to recover damages under both Section 553 and 605."

Id. at *7.

　　　　This Court agrees with the reasoning in Frei and Bear

and concludes that J & J cannot ultimately recover under both § 553 and § 605. Although the instant case is beyond the pleading stages addressed in <u>Frei</u> and <u>Bear</u>,[2] this Court also concludes that it is not necessary at this time to require J & J to choose which remedy it will seek. At this stage, J & J may still pursue Count I and Count II as alternate theories of relief against A. Alcantara.

## III. <u>Conversion</u>

A. Alcantara also argues that Count III fails as a matter of law because the Hawai`i courts have not recognized a conversion claim based on the taking of intangible property. This Court agrees.

The Intermediate Court of Appeals of Hawai`i ("ICA") has stated that:

> Conversion encompasses the following acts: "(1) A taking from the owner without his consent; (2) an unwarranted assumption of ownership; (3) an illegal use or abuse of the chattel; and (4) a wrongful detention after demand." <u>Tsuru v. Bayer</u>, 25 Haw. 693, 696 (1920). The evidence presented established a prima facie case that [the Department of Hawaiian Home Lands ("DHHL")] committed acts (1) and (2) of this definition by rounding up and selling Nobriga's cattle without his consent. DHHL emphasizes that it mistakenly believed its actions were lawful. However, conversion does not require wrongful intent. 18A Am. Jur. 2d Conversion § 3 (2010); <u>Federal Ins.</u>

---

[2] <u>Frei</u> involved the plaintiff's motion for default judgment. 2013 WL 3190685, at *1. <u>Bear</u> involved the plaintiff's motion to strike the answer and its motion to strike affirmative defenses. 2013 WL 708490, at *1.

> Co. v. Fries, 78 Misc. 2d 805, 355 N.Y.S.2d 741,
> 744 (N.Y. City Civ. Ct. 1974). "[T]he defendant's
> knowledge, intent, motive, mistake, and good faith
> are generally irrelevant." Morissette v. United
> States, 342 U.S. 246, 253, 72 S. Ct. 240, 96 L.
> Ed. 288 (1952). "So long as he [or she] intends
> to deal with the property in a way which is in
> fact inconsistent with the plaintiff's right, he
> [or she] is a converter." Fries, 355 N.Y.S.2d at
> 744.

Freddy Nobriga Enters., Inc. v. State, Dep't of Hawaiian Home

Lands, 129 Hawai`i 123, 129-30, 295 P.3d 993, 999-1000 (Ct. App.

2013) (some alterations in Freddy Nobriga Enters.).

J & J has not identified any Hawai`i authority

recognizing that the unauthorized taking of intangible property

can give rise to a conversion claim, nor has J & J cited any

Hawai`i authority holding that a broadcast signal is considered

chattel for purposes of a conversion claim. At least one

decision from this district court supports A. Alcantara's

position that a Hawai`i law conversion claim cannot be based upon

the taking of an intangible interest.

> Plaintiff cites to no caselaw, nor can the court
> find any, in support of the proposition that [a]
> person's time can be considered chattel. Indeed,
> at least one court in Illinois has found to the
> contrary. See Stonecrafters, Inc. v. Foxfire
> Printing & Packaging, Inc., 633 F. Supp. 2d 610,
> 613 n.1 (N.D. Ill. 2009) ("[U]nder the theory of
> conversion . . . a person's time is not a chattel
> over which plaintiff had the immediate and
> unconditional right to possess.") In any event
> the Plaintiff has not sufficiently demonstrated
> that any of its "chattel" was taken without its
> consent. See Tsuru, 25 Haw. at 696 (finding one
> element of conversion is "[a] taking from the
> owner without his consent"); [Sung v.] Hamilton,

8

> 710 F. Supp. 2d [1036,] 1043 [(D. Hawai`i 2010)]
> (same); <u>Pourny [v. Maui Police Dep't]</u>, 127 F.
> Supp. 2d [1129,] 1146 [(D. Hawai`i 2000)]
> (granting summary judgment where a Plaintiff did
> not show that Defendant "took chattel from
> Plaintiff without his consent").

<u>BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.</u>, 780 F. Supp. 2d

1061, 1081 (D. Hawai`i 2011) (some alterations in <u>BlueEarth</u>).

This Court recognizes that J & J has cited case law

from outside of Hawai`i supporting its position that the taking

of a broadcast signal can support a conversion claim.

A. Alcantara has also cited case law from other jurisdictions

concluding that a broadcast signal cannot support a conversion

claim. These cases, however, are not controlling as to the issue

of whether Hawai`i law recognizes such a claim.

This Court has supplemental jurisdiction over Count

III. <u>See</u> 28 U.S.C. § 1367(a). "When a district court sits in

diversity, or hears state law claims based on supplemental

jurisdiction, the court applies state substantive law to the

state law claims." <u>Mason & Dixon Intermodal, Inc. v. Lapmaster</u>

<u>Int'l LLC</u>, 632 F.3d 1056, 1060 (9th Cir. 2011). This Court has

recognized that:

> When interpreting state law, a federal court is
> bound by the decisions of a state's highest court.
> <u>Trishan Air, Inc. v. Fed. Ins. Co.</u>, 635 F.3d 422,
> 427 (9th Cir. 2011). In the absence of a
> governing state decision, a federal court attempts
> to predict how the highest state court would
> decide the issue, using intermediate appellate
> court decisions, decisions from other
> jurisdictions, statutes, treatises, and

restatements as guidance. <u>Id.</u>; <u>see also</u>
<u>Burlington Ins. Co. v. Oceanic Design & Constr.,</u>
<u>Inc.</u>, 383 F.3d 940, 944 (9th Cir. 2004) ("To the
extent this case raises issues of first
impression, our court, sitting in diversity, must
use its best judgment to predict how the Hawai`i
Supreme Court would decide the issue." (quotation
and brackets omitted)).

<u>Evanston Ins. Co. v. Nagano</u>, 891 F. Supp. 2d 1179, 1189 (D.

Hawai`i 2012) (some citations omitted).

        In light of the Hawai`i Supreme Court's statements in

<u>Tsuru</u> and the ICA's holding in <u>Freddy Nobriga Enterprises</u>, this

Court predicts that the Hawai`i Supreme Court will hold that,

under Hawai`i law, the tort claim of conversion does not extend

to the unauthorized taking of intangible property.  This Court

therefore concludes that J & J's conversion claim alleging the

unauthorized interception and broadcast of the Program fails as a

matter of law.  A. Alcantara's Motion is GRANTED as to Count III,

which is DISMISSED as to both A. Alcantara and C. Alcantara.

## IV.  Individual Liability Under the
##       Cable Act and the Communications Act

        Under either § 553 or § 605, "[t]o hold a person liable

in his or her individual capacity, the plaintiff must demonstrate

that the individual authorized the violation or had both a right

and ability to supervise the violations and a strong financial

interest in such activities." <u>J & J Sports Prods., Inc. v. La</u>

<u>Reyna Mexican Rest. & Mariscos LLC</u>, No. 2:12-CV-1528 JCM (PAL),

2013 WL 4006500, at *4 (D. Nev. Aug. 5, 2013) (citing <u>Joe Hand</u>

Promotions, Inc. v. Soviero, 11 CV 1215 NGG, 2012 WL 3779224, at
*9 (E.D.N.Y. July 31, 2012) *report and recommendation adopted*,
11-CV-1215 NGG CLP, 2012 WL 3779221 (E.D.N.Y. Aug. 30, 2012)).

It is undisputed that A. Alcantara attended the
Pacquiao v. Mosley fight in person and therefore was not
physically present at Filipino Express either during the fight or
immediately before and after the fight.  [A. Alcantara's Concise
Statement of Facts, filed 1/24/14 (dkt. no. 17) ("A. Alcantara
CSOF") at ¶¶ 5, 7;[3] Pltf.'s Concise Statement, filed 2/17/14
(dkt. no. 20) ("J & J's CSOF"), at ¶ 6 (stating that J & J does
not dispute, *inter alia*, facts 5 and 7 of A. Alcantara's CSOF).]
A. Alcantara asserts that, if Filipino Express did intercept and
broadcast the Program, he neither authorized nor supervised those
activities.  Further, he argues that he did not have a strong
financial interest in the interception and broadcast.  [Mem. in
Supp. of Motion at 3.]

According to A. Alcantara's declaration that he
submitted with the Motion, he was previously the president of
Philippine Import and Export Corporation ("PIEC").  PIEC's
primary business was a retail store in Waipahu called the
Filipino Seafood and Vegetable Market, which PIEC opened in or
about 1993 ("the Market").  A. Alcantara closed the Market in or
about 2000.  [A. Alcantara Decl. at ¶¶ 2-5.]

---

[3] The facts in the A. Alcantara CSOF are not numbered.

In or about 1994, C. Alcantara opened Filipino Express in a vacant commercial space next to the Market. When A. Alcantara closed the Market, C. Alcantara used the Market's space to expand Filipino Express. According to A. Alcantara, from the beginning of Filipino Express, C. Alcantara was the owner and operator of the restaurant. A. Alcantara neither owned Filipino Express, had control over its activities, nor had knowledge of the details of its operations. [Id. at ¶¶ 6-10.] After A. Alcantara closed the Market in 2000, he went to work for his father's construction business in Honolulu, but in or about 2010, A. Alcantara left his father's business to start a Guam-based construction and contracting business, called First Pacific Builders, LLC. From about 2009, A. Alcantara traveled back and forth between Honolulu and Guam for business. [Id. at ¶¶ 11-13.] Thus, A. Alcantara states that, at the time of the alleged interception and broadcast of the Program, he did not own, operate, or control Filipino Express. [Id. at ¶ 27.]

Insofar as he was not present at Filipino Express on the day of the Program, A. Alcantara asserts that he does not know who was at Filipino Express, and he "did not instruct, permit, authorize, or allow anyone else to intercept any cable signal or satellite broadcast of" the Program. [Id. at ¶ 25.] In response, J & J contends that A. Alcantara could have authorized or directed the interception and broadcast of the

12

Program, even though he was not physically present. J & J
presented evidence that "Filipino Express Restaurant" was a
registered trade name of PIEC for the period from August 22, 2006
to August 21, 2011. [Mem. in Opp., Decl. of Dan S. Ikehara
("Ikehara Decl."), Exh. 1 (Application for Registration of Trade
Name, dated 5/19/06 by the treasurer of PIEC, and signed by the
Department of Commerce and Consumer Affairs, State of Hawai`i
("DCCA") on 5/19/06).] A. Alcantara signed a Domestic Profit
Corporation Annual Report as of April 1, 2010 for PIEC stating
that the nature of PIEC's business is a restaurant, and
A. Alcantara and C. Alcantara were listed as PIEC's only officers
and directors. [Ikehara Decl., Exh. 2.] The DCCA
administratively dissolved PIEC on December 2, 2011 "for failure
to file an annual report for a period of two years or remit fees
as required by law." [Id., Exh. 3 (DCCA Certificate of
Administrative Dissolution).] On August 27, 2012, Anacleto
Alcantara, Sr. and C. Alcantara filed Articles of Organization
for Limited Liability Company for a company called "Kambingan
Filipino Express Restaurant LLC" ("Kambingan LLC"). [Id., Exh.
4.] A. Alcantara is listed as one of the four organizers of
Kambingan LLC and as one of the four members of the company,
which is identified as member-managed. [Id.]

　　　　J & J emphasizes that the Domestic Profit Corporation
Annual Report shows that A. Alcantara and C. Alcantara have the

same residence address, which J & J argues indicates that
A. Alcantara likely knew about Filipino Express's daily
operations. J & J argues that, even if C. Alcantara managed the
day-to-day operations of Filipino Express, A. Alcantara was the
president and director of PIEC and thus had ownership, control,
and oversight over Filipino Express. J & J also emphasizes that
A. Alcantara is currently a manager of Filipino Express, with his
family members, under the new name Kambingan LLC. Further, they
continue to have the same residence address. J & J argues that
there is sufficient evidence to show A. Alcantara's control over
Filipino Express on the day of the Program, even though he was
not physically present. [Mem. in Opp. at 8-9.] At the hearing
on the Motion, J & J's counsel acknowledged that the DCCA filings
are the only evidence that J & J has of A. Alcantara's alleged
control over and interest in Filipino Express.

This Court will not consider the evidence that J & J
submitted regarding Kambingan LLC because that entity was not
formed until after the Program. Insofar as this Court must view
the current record in the light most favorable to J & J, this
Court can assume that A. Alcantara is a member and officer in
Kambingan LLC and that an illegal broadcast of the Program
occurred at Filipino Express. See Crowley v. Bannister, 734 F.3d
967, 976 (9th Cir. 2013) ("We review a grant of summary judgment
de novo and must determine, viewing the facts in the light most

14

favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." (citations and quotation marks omitted)). A. Alcantara's role in the new entity, however, is not relevant to the issue of whether A. Alcantara authorized or supervised the alleged interception and broadcast of the Program.

Further, even assuming that PIEC owned, or otherwise operated, Filipino Express at the time of the alleged interception and broadcast of the Program, and even assuming that A. Alcantara was an officer and director of PIEC at that time, A. Alcantara's role and interest in PIEC is not enough to raise a genuine issue of fact as to whether A. Alcantara either authorized the allegedly illegal broadcast of the Program or had the right and ability to supervise the alleged broadcast. <u>See</u> Fed. R. Civ. P. 56(a) (stating that a moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Moreover, neither A. Alcantara's role and interest in PIEC nor his relationship to C. Alcantara is enough to raise a genuine issue of fact as to whether A. Alcantara had a strong financial interest in the alleged interception and broadcast.

J & J urges this Court to follow <u>Joe Hand Promotions,</u>

15

<u>Inc. v. Jorgenson</u>, No. 12-C-0159, 2013 WL 64629 (E.D. Wis.

Jan. 4, 2013), in which the district court rejected the

individual defendant's argument that he had no supervisory

control over the alleged interception and broadcast at issue in

that case.  <u>Jorgenson</u> is distinguishable from the instant case

because it was undisputed that the plaintiff, Donald L.

Jorgenson, Jr., owned the lodge where the alleged interception

and broadcast occurred.  Further, Jorgenson did not present any

evidence to contest the fact that he operated the lodge as a sole

proprietor doing business as "DJ's Moose Knuckle Lodge."  2013 WL

64629, at *2.  In denying Jorgenson's motion for summary

judgment, the district court noted:

> The designation "d/b/a" means "doing business
> as," but is merely descriptive of the person or
> corporation who does business under some other
> name.  <u>Duval v. Midwest Auto City, Inc.</u>, 425 F.
> Supp. 1381, 1387 (D. Neb. 1977).  "Doing business
> under another name does not create an entity
> distinct from the person operating the business.
> The individual who does business as a sole
> proprietor under one or several names remains one
> person, personally liable for all his
> obligations."  <u>Plumbers' Pension Fund v. Wright</u>,
> No. 86-C-1485, 1987 WL 10577, at *1 (N.D. Ill. May
> 1, 1987) (quoting <u>Duval</u>, 425 F. Supp. at 1387).
> As such, the owner or sole proprietor and their
> business are one and the same.  <u>Smith v. Castaways
> Family Diner</u>, 453 F.3d 971, 978 (7th Cir. 2006)
> ("Legally, [the restaurant owner] as the sole
> proprietor is [the restaurant]; she is the
> individual, whether by hands-on management or
> delegation to others of her choosing, who decides
> the course of the business."); <u>Moriarty v. Svec</u>,
> 164 F.3d 323, 336 (7th Cir. 1998) (Manion, J.,
> concurring) (noting that a sole proprietorship has
> no legal identity apart from the individual who

> owns it). Therefore, DJ's Moose Knuckle Lodge, so
> far as the evidence before me indicates, is
> nothing more than an assumed name, and not a legal
> entity. Rather, it is simply the name under which
> Jorgenson transacted his business. As there is no
> evidence that Jorgenson chose to organize his
> business as a corporation or other limited
> liability entity, he has asserted no basis for
> concluding he is sheltered from liability.

Id. (alterations in Jorgenson). In contrast, in the instant

case, Filipino Express is operated through a business entity, and

there is no evidence of A. Alcantara's involvement in, or

financial benefit from, the alleged interception and broadcast of

the Program. This Court therefore declines to follow Jorgenson.

Similarly, in other cases where the district court

allowed the Cable Act and Communication Act claims against the

individual defendant to go forward, the individual's ownership of

and control over the establishment where the alleged interception

and broadcast occurred was not in dispute. See, e.g., La Reyna

Mexican Rest., 2013 WL 4006500, at *4 (the individual

acknowledged that he was the owner of the restaurant, and there

was evidence that he was "the only member/officer of the

commercial establishment"); Soviero, 2012 WL 3779224, at *9 (the

complaint's allegation that the individual defendant "had the

requisite control and financial interest to be held vicariously

liable for the violation" was accepted as true because the

individual defendant had "defaulted in this action").[4]

In the instant case, there is no evidence that
A. Alcantara had the level of control over and financial interest
in Filipino Express's alleged interception and broadcast of the
Program that was present in cases such as Jorgenson, La Reyna
Mexican Restaurant, and Soviero.  This Court notes that at least
one district court within the Ninth Circuit has disagreed with
Jorgenson.  See Joe Hand Promotions, Inc. v. Albright, No. CIV.
2:11-2260 WBS CMK, 2013 WL 4094411, at *3 (E.D. Cal. Aug. 13,
2013).  That court stated, "this court does not necessarily agree
with the court's observation in Jorgenson.  In this court's view,
under certain circumstances, an absentee owner could be unaware
that an unauthorized broadcast was shown at his establishment."
Id.  The district court in Albright also distinguished the facts
of Jorgenson, noting that: "In Jorgenson, there was a large sign
advertising the unauthorized program's broadcast.  It would be
much more difficult to believe that the defendant owner had no
knowledge of such an event in that case, than here, where there
was no evidence of promotion."  Id. (some citations omitted)
(citing Jorgenson, 2013 WL 64629, at *3).

This Court agrees with the district court in Albright
that, there may be situations where an absentee owner was unaware

_____

[4] 2012 WL 3779224 is the magistrate judge's report and
recommendation, which the district judge adopted in 2012 WL
3779221 (E.D.N.Y. Aug. 30, 2012)

18

that his establishment broadcasted an illegally intercepted program.  The absentee owner, however, may still be liable under the Cable Act and Communications Act if he had the right and ability to supervise, as well as a strong financial interest in, the interception and broadcast.  The district court in <u>Albright</u> ultimately ruled that the owner was not liable because, although he was "'doing business as' Miners Ranch Saloon [and was therefore] legally indistinguishable from Miners Ranch Saloon, . . . there was no evidence that defendant exhibited the Program for commercial or personal advantage."  <u>Id.</u>

In the instant case, J & J has failed to raise a triable issue of fact as to either: 1) whether A. Alcantara authorized the alleged interception and broadcast of the Program; or 2) whether A. Alcantara had the right and ability to supervise the alleged interception and broadcast.  Further, although there is evidence that Filipino Express had a substantial financial interest in the alleged interception and broadcast of the Program, there is no evidence that A. Alcantara had a substantial financial interest in the alleged interception and broadcast.

This Court therefore finds that J & J has failed to raise a genuine issue of material fact as to A. Alcantara's individual liability, and this Court concludes that A. Alcantara is entitled to judgment as a matter of law as to Count I and Count II.

## CONCLUSION

On the basis of the foregoing, A. Alcantara's Motion for Summary Judgment, filed January 24, 2014, is HEREBY GRANTED. Count III is DISMISSED WITH PREJUDICE as to C. Alcantara and A. Alcantara, and this Court GRANTS summary judgment in favor of A. Alcantara as to Count I and Count II.  There being no remaining claims against A. Alcantara, this Court DIRECTS the Clerk's Office to terminate him as a party.

J & J's claims against C. Alcantara in Count I and Count II remain.  Insofar as J & J has obtained an entry of default against C. Alcantara, this Court DIRECTS J & J to file its motion for default judgment by **May 13, 2014**.  J & J's motion for default judgment must specify whether J & J seeks damages against C. Alcantara under Count I or Count II.  This Court cautions J & J that, if it fails to file its motion for default judgment by **May 13, 2014**, this Court will issue an order to show cause why J & J's claims against C. Alcantara should not be dismissed.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 25, 2014.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**J & J SPORTS PRODUCTIONS, INC. VS. ANACLETO S. ALCANTARA, JR. ET AL; CIVIL NO. 13-00220 LEK-RLP; ORDER GRANTING DEFENDANT ANACLETO S. ALCANTARA JR.'S MOTION FOR SUMMARY JUDGMENT**